IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CLINETTA HUTCHERSON, | ) | Case No. 3:18-CV-592 |
| *on behalf of* M.V., | ) | |
| | ) | JUDGE JEFFREY J. HELMICK |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Clinetta Hutcherson, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for supplemental security income benefits on behalf of her minor child, M.V., under Title XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the ALJ failed to apply proper legal procedures and reach a decision supported by substantial evidence, I recommend that the final decision of the Commissioner be VACATED, and the matter be REMANDED for further proceedings.

## II.    Procedural History

On March 12, 2015, Hutcherson applied for supplemental security income on behalf of her minor child, M.V.  (Tr. 192); ECF Doc. 13, Page ID# 1048.  Hutcherson alleged that M.V. became disabled on September 1, 2006, due to cognitive delay, ADHD, and "pervasive developmental disorder-NOS learning disability/ADHD/cognitive disability/motor skill."  (Tr.

121, 192).  The Social Security Administration denied Hutcherson's application initially and upon reconsideration.  (Tr. 121–30, 132–42).  Hutcherson requested an administrative hearing. (Tr. 157).  Administrative Law Judge ("ALJ") Terry Banks heard the case on December 13, 2016, and denied the claim in an April 6, 2017, decision.  (Tr. 32–53, 74–111).  On January 16, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–6).  On March 14, 2018, Hutcherson filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

**III.     Standard for Child Disability Claims**

The standard for evaluating a child disability claim differs from that used for an adult's claim.  42 U.S.C. § 1382c(a)(3)(C); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002).  A child is considered disabled if he has a "medically determinable physical or mental impairment that results in marked and severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C).  To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a).  At Step One, a child must not have engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At Step Two, a child must be found to suffer from a "severe impairment."  20 C.F.R. § 416.924(c).  At Step Three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1.  20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listed impairments, the Commissioner must assess the functional limitations caused by the impairment by evaluating how a child functions in six domains: (1) acquiring and using information; (2) attending and

completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [oneself]; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  If a child's impairment results in "marked" limitations[1] in two domains, or an "extreme" limitation[2] in one domain, the impairments functionally equal the listings and the child will be found disabled.  20 C.F.R. § 416.926a(d).

## IV.    Evidence

### A.    School Evidence

On April 22, 2015, M.V.'s teacher, Pamela Jackson, indicated that he had "poor" attention/concentration and "very poor" organization, completion of work and turning in work on time.  (Tr. 279).  She stated that she constantly asked M.V. for missing work.  (*Id.*).

On April 24, 2015, M.V.'s special education teacher, Charita Bagland, stated that M.V. paid attention during instruction, tried his best on most assignments, and returned his homework; however, he was unable to comprehend instructions/concepts without having them broken down for him and he had poor expressive language.  (Tr. 273).  Bagland indicated that M.V. had "fair" behavior, attention/concentration, organization, and completion of work, but he had poor communication skills.  (Tr. 275).  She stated that M.V. was easily frustrated, needed small group or one-on-one instruction, and needed extended time and repeated directions.  (*Id.*).

---

[1] A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).  A "marked" limitation is "more than moderate" but "less than extreme."  *Id.*  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  *Id.*

[2] An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation means "more than marked."  *Id.*  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  *Id.*

On May 6, 2015, speech and language pathologist ("SLP") Janis Plezia-Dollman evaluated M.V. for autism following his pervasive developmental disorder diagnosis. (Tr. 255–61). Plezia-Dollman indicated that M.V. had difficulty taking others' perspective, understanding sarcasm and metaphors, letting go of arguments, responding to inquiries about himself, introducing and discussing topics clearly, expressing relevant information concisely, appropriately interrupting peers and adults, appropriately asking speakers for clarification, and changing topics flexibly. (Tr. 257–59). She indicated that M.V. needed specialized services and extra adult support to help him learn social/pragmatic skills and respond to cues and situations in the classroom. (Tr. 261). On the same day, M.V. told another evaluator that he did not have any trouble paying attention in school. (Tr. 265). The evaluator stated that M.V. had a full-scale IQ of 72, indicating that he learned at a significantly slower pace than his peers, and that he had difficulty with following three-part instructions. (Tr. 265, 271).

On November 30, 2016, intervention specialist Heather Langsdorf completed a teacher questionnaire. (Tr. 350–57). Langsdorf indicated that M.V. had serious problems with comprehending oral instructions, understanding and participating in class discussions, learning new material, carrying out single-step instructions, organizing his own things and school materials, and managing the pace of physical activities or tasks. (Tr. 351–54). He had very serious problems with providing organized oral explanations and adequate descriptions, recalling and applying previously learned materials, applying problem-solving skills in class discussions, carrying out multi-step instructions, completing class/homework assignments, completing work accurately without careless mistakes, working at a reasonable pace, and planning, remembering, and executing controlled motor movements. (*Id.*). He had obvious problems with paying attention when spoken to directly, focusing long enough to finish assigned activities, and

refocusing to task when necessary.  (Tr. 352–53).  Langsdorf indicated that M.V. had slight problems with changing from one activity to another without being disruptive, working without distracting himself or others, and following rules.  (*Id.*).  She stated that M.V. needed material to be taught in chunks at a slower space, struggled with large group settings, and became immediately frustrated and shut down when presented with challenging tasks.  (*Id.*).

Also, on November 30, 2016, M.V.'s science teacher, Tina Bossenbroek, completed a teacher questionnaire.  (Tr. 366–73).  Bossenbroek indicated that M.V. had serious problems with comprehending oral instructions, expressing ideas in writing, learning new material, recalling and applying previously learned material, carrying out multi-step instructions, completing work accurately without careless mistakes, and working at a reasonable pace/finishing on time.  (Tr. 367–68).  He had very serious problems with understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, applying problem-solving skills in class discussions, completing class/homework assignments, and knowing when to ask for help.  (Tr. 367–68, 371).  M.V. had obvious problems with carrying out single-step instructions and organizing his own things or school materials.  (Tr. 368).  He had slight problems with paying attention when spoken to directly, focusing long enough to finish assigned activities or tasks, and refocusing to task when necessary.  (*Id.*).  He did not have any problems changing from one activity to another without being disruptive or working without distracting himself or others.  (*Id.*).

On December 2, 2016, M.V.'s homeroom and Spanish teacher, Kristi Rohrer, completed a teacher questionnaire.  (Tr. 358–65).  Rohrer indicated that M.V. had serious problems with providing organized oral explanations and adequate descriptions, expressing ideas in writing, learning new material, recalling and applying previously learned material, applying

problem-solving skills in class discussions, completing class/homework assignments, completing work accurately without careless errors, and working at a reasonable pace/finishing on time. (Tr. 359–60).  She indicated that M.V. had obvious problems with comprehending instructions, understanding and participating in class discussions, paying attention when spoken to directly, focusing long enough to finish assigned activities or tasks, carrying out multi-step instructions, and organizing his own things or school materials.  (*Id.*).  He had slight problems refocusing to task when necessary and carrying out single-step instructions, and he had no problem with changing from one activity to another without being disruptive and working without distracting himself or others.  (Tr. 360).  Rohrer noted that M.V. was getting better at organizing materials, but that he still needed repeated and reworded instructions and tasks broken into smaller steps. (Tr. 360).

### B.    Relevant Medical Evidence

On September 20, 2010, M.V. went to the Zepf Community Mental Health Center ("Zepf Center") for a diagnostic assessment.  (Tr. 393).  The assessment indicated that M.V. did not develop the ability to understand simple commands between ages 1 and 3, he did not develop empathy or the ability to sit for at least 10 minutes or follow directions and rules by ages 3 to 5, and he did not develop the peer relationships or the ability to follow directions and rules by ages 5 to 12.  (Tr. 395).  The assessment indicated that M.V. deliberately annoyed others, had mood swings, interrupted others, was easily distracted, had temper tantrums, was aggressive toward others, had few or no friends, destroyed property, ran away, and did not seem to listen when spoken to directly.  (Tr. Tr. 395–96).  Hutcherson reported that M.V. had an individual education plan due to a cognitive delay, he had anxiety when his dad was not home, and he got angry with other kids and adults.  (Tr. 397, 402).  The assessment indicated that M.V. was diagnosed with

6

disruptive disorder and pervasive developmental disorder, was disruptive at school, hit a teacher, tried to leave, threatened to bring a knife to school, and had a global assessment of functioning ("GAF") score of 60. (Tr. 405–406). In a related mental status evaluation, the clinician noted that M.V. did not respond to questions when asked, was withdrawn, and appeared to have borderline intelligence. (Tr. 408).

On September 30, 2011, Karen Kindervater, M.D., a psychiatrist at the Zepf Center, conducted an initial evaluation. (Tr. 409–12). Dr. Kindervater noted that M.V. was severe issues with impulsivity, hyperactivity, and attention/concentration; moderate issues with irritability and exaggerated changes in mood; and mild issues with resistant behavior. (Tr. 410–11). She estimated that M.V. had borderline intelligence and poor insight/judgment. (Tr. 411). She diagnosed M.V. with ADHD, mood disorder, pervasive developmental disorder, and sensory processing disorder. (*Id.*). She gave M.V. a GAF score of 35 and prescribed him an ADHD medication. (*Id.*). At follow-ups visits on December 5, 2011, and March 5, 2012, Dr. Kindervater noted that M.V. was doing better on his meds, and that Hutcherson reported he went straight to his homework when he got home. (Tr. 431, 433). On December 16, 2013, Dr. Kindervater noted that M.V. had not been on any medications since he was last seen in March 2012, that the school did not report any problems, and that Hutcherson reported that M.V. had problems with doing homework, fidgeting, and distraction. (Tr. 427). On February 13, 2014, Dr. Kindervater noted that M.V. was once again doing better on meds, and that he would receive honor awards at school. (Tr. 423). On April 4, 2014, Dr. Kindervater noted that M.V. was again not taking his medications, and that he was more talkative, distracted, fidgety, and impulsive. (Tr. 419). She noted that M.V.'s teachers reported defiant behaviors and peer issues beyond his ADHD, and she discussed autistic spectrum symptoms. (*Id.*). On August 26, 2014, Dr.

Kindervater noted that M.V. had been off his medications over the summer, and that he was hyperactive and hyperverbal. (Tr. 414–15). She prescribed a new ADHD medication and gave him a GAF score of 45. (Tr. 416).

On March 26, 2014, M.V. saw Amanda Bebeau, LSW, at Harbor Behavioral Healthcare ("Harbor") for a diagnostic assessment. (Tr. 520–26). Hutcherson told Bebeau that M.V. did not do well with change; he had hit, bit, and kicked teachers at school; and he threw things, scratched himself, and threatened others when he needed to do homework or other activities he did not like. (Tr. 520, 523). Hutcherson also reported that M.V. was below average on most of his developmental milestones. (Tr. 522). On examination, Bebeau noted that M.V. was impulsive, avoided eye contact, had abnormal speech articulation and volume, had poor insight and judgment, and had impaired attention. (Tr. 524). She noted that M.V. hit his hands on his legs repeatedly and moved his legs up and down during the interview, but that he was able to answer all questions appropriately and remain seated throughout the entire assessment. (Tr. 525). Bebeau diagnosed M.V. with disruptive behavior disorder and borderline intellectual functioning. (Id.).

From April 10, 2014, through March 23, 2016, M.V. saw Allison Burke, Ph.D., at Harbor for 31 counseling sessions. (Tr. 529, 534–37, 547–48, 573–76, 580–81, 588–89, 598–601, 605–06, 613–16, 620–21, 625–26, 633–34, 806–33). Dr. Burke's therapy sessions focused on M.V.'s behavioral, emotional, and communication development, and Dr. Burke regularly noted that M.V. exhibited "some improvement." (Tr. 534, 536, 548, 555, 573, 580, 599, 605, 613, 615, 620–21, 625, 806–33). Dr. Burke regularly noted that M.V. struggled with completing his homework and getting organized in the morning. (Tr. 536, 625, 590, 600, 806). On April 23, 2014, Dr. Burke noted that M.V. did his homework and chores without complaining; however,

8

he had difficulty following multi-step directions.  (Tr. 534).  On June 24, 2014, Hutcherson told

Dr. Burke that M.V. was dependent on her to complete household tasks, but that she believed he

could complete them on his own.  (Tr. 555).  On November 16, 2015, Dr. Burke noted that

M.V.'s school progress reports were generally positive.  (Tr. 824).  On January 25, 2016,

Dr. Burke noted that M.V. needed frequent reminders to complete his chores because he became

distracted.  (Tr. 826).

From April 23, 2014, through May 7, 2015, M.V. received home services from Kelli

Gray, QMHS, at Harbor.  (Tr. 531, 538–56, 570–72, 577–79, 582–87, 595–99, 602–12, 617–24,

627–32, 635–43).  On May 12, 2014, Hutcherson told Gray that M.V. had not brought home his

homework since February.  (Tr. 540).  On June 16, 2014, she noted that M.V. was involved in

football, and that Hutcherson wanted him to start doing other activities as well.  (Tr. 551).  On

July 8, 2014, October 29, 2014, and December 3, 2014, she noted that he was doing well in

school and his activities, including football and drumming.  (Tr. 579, 587, 597).

On May 9, 2014, Cheryl Reese, LSW, assed M.V. for autism spectrum disorder.

(Tr. 438–46).  Reese noted that M.V. tended to be less involved in group activities, a strong need

for routine, problems handling transition and change, difficulty with rules of conversation,

difficulty making relevant comments and understanding conversation, poor problem-solving

skills, poor organization skills, difficulty staying focused, difficulty applying learned skills in

new settings, difficulty starting or completing actions, and low frustration tolerance.  (Tr. 439–

40).  Testing indicated that he had a "possibility of autism" and a "likely probability of

Asperger's Disorder."  (Tr. 440).  Reese diagnosed M.V. with pervasive developmental disorder

on the autism spectrum and ADHD, and she gave M.V. a GAF score of 56.  (Tr. 446).

On July 8, 2014, Angela Capuano, Ph.D., issued a psychological testing report. (Tr. 557–69). Hutcherson told Dr. Capuano that M.V.:

> sometimes fail[ed] to give close attention to details or [made] careless mistakes, often [did]] not seem to listen when spoken to directly, sometimes [did] not follow through on instructions and fail[ed] to finish activities; often [had] difficulty organizing tasks and activities; often avoid[ed], dislike[d], or [was] reluctant to engage in tasks that require[d] sustained mental effort, and [was] often easily distracted by extraneous stimuli.

(Tr. 558). Hutcherson also reported that M.V. attended mainstream classes, with additional supports, and that his grades were As and Bs. (Tr. 558–59). On examination, Dr. Capuano noted that M.V. was cooperative, completed all tasks presented to him, and "maintain[ed] his attention and concentration throughout the extensive testing." (Tr. 560). She noted that M.V.'s scores indicated that he had "moderately low" daily living skills and domestic living skills, and "low" community living skills. (Tr. 562). Dr. Capuano determined that M.V. had a full-scale IQ of 70, with a nonverbal IQ of 77 (problem solving and recall), a fluid reasoning index of 73, a visual-spatial index of 68, and a working memory index of 80. (Tr. 563–64). She stated that M.V.'s scores indicated that his "medications adequately manage[d] his ADHD symptoms," and that his performance was not consistent with autism spectrum disorder. (Tr. 565). Dr. Capuano diagnosed M.V. with ADHD, unspecified depressive disorder, and borderline intellectual functioning, and she gave him a GAF score of 55. (Tr. 566).

On November 5, 2014, M.V. saw Deepa Khushlani, M.D., at Harbor for a psychological evaluation. (Tr. 487–93). Hutcherson told Dr. Khushlani that M.V. had some calls home from school for behavior issues, that he did not do well with change, and that he had issues with substitute teachers. (Tr. 487). She told Dr. Khushlani that M.V. had issues with anger, inattention, oppositional patterns, argumentativeness, social isolation, being inflexible, and hyperkinesis. (*Id.*). Hutcherson said that M.V. rushed through his work, did not like to ask for

help, had poor organizational skills, and had "restricted interests" in football and videogames. (*Id.*). Dr. Khushlani noted that M.V. was below average in his developmental milestones, and that he had poor socialization with his peers. (Tr. 489). Dr. Khushlani noted that M.V. avoided eye contact, was impulsive, had below average intellect, had abnormal speech articulation and volume, had fair insight, had poor judgment, and had impaired attention. (Tr. 490).

Dr. Khushlani diagnosed M.V. with ADHD, Asperger's disorder, borderline intellectual functioning, and depressive disorder. (Tr. 492). Dr. Khushlani indicated that M.V. had a GAF score of 55, indicating moderate difficulty in social, occupational, or school functioning. (*Id.*). She recommended that M.V. continue with treatment through therapy and medication. (Tr. 493). At a follow-up on December 3, 2014, Dr. Khushlani noted that M.V. appeared to be doing better with support and that he had a more stable mood; however, he was fidgety, hyperactive, and had difficulty transitioning to his new school. (Tr. 496). Dr. Khushlani did not note any significant changes in his condition on January 14, 2015. (Tr. 501–06). On February 12, 2015, Dr. Khushlani noted that M.V. was struggling in his classes, made careless mistakes, had difficulty organizing tasks, avoided tasks that required ongoing mental effort, got distracted by noises, and was forgetful in daily activities. (Tr. 507). On March 19, 2015, Dr. Khushlani noted that M.V. was doing better in school, even though the school did not follow his accommodations. (Tr. 513). On June 23, 2015, Dr. Khushlani indicated that M.V. was responding to enhanced supports at his new school, he was better able to control his frustration and impulsivity, and his attention span was "fair.". (Tr. 779–81).

On September 30, 2015, M.V. saw nurse practitioner Coleen Shaw at Harbor and for a medication review. (Tr. 782–85). Shaw noted that M.V. was prescribed an ADHD medication, and that he appeared to be responding to enhanced support at his new school. (Tr. 782). M.V.

11

told Shaw that he was frequently bored in class, and that he played video games with his friend. (*Id.*).  Shaw noted that he was restless and fidgety, and that he had an outburst related to not understanding his homework.  (*Id.*).  On examination, Shaw noted that M.V. had normal thought content, below average intellect, normal speech, fair insight, poor judgment, fair attention span, and intact memory.  (Tr. 783).  She diagnosed M.V. with Asperger's syndrome, ADHD, borderline intellectual functioning, and unspecified depressive disorder.  (Tr. 784).  She continued M.V.'s medications.  (Tr. 785).  On December 4, 2015, Hutcherson told Shaw that M.V. preferred to stay in the house and watch TV, and that she had to push him to do things; however, she did not have problems getting him to do his homework.  (Tr. 790).  At follow-ups on March 2, 2016, June 13, 2016, and September 15, 2016, Shaw did not note any significant changes in M.V.'s condition, and continued his medications.  (Tr. 794–805).

On October 29, 2015, M.V. saw nurse Mandy Phillips at Harbor for a medication review. (Tr. 786–89).  Phillips noted that M.V. was compliant with his medication, that it appeared to be working well, and that M.V. was doing well in school.  (Tr. 786).

From April 11, 2016, through October 13, 2016, M.V. saw Alicia Barrett, LSW, for eight counseling sessions.  (Tr. 834–49).  On April 11, 2016, Hutcherson asked Barrett to focus counseling on developing M.V.'s social skills and participation in gong places outside the home. (Tr. 834).  Barrett noted that M.V. did not exhibit any change in his condition throughout counseling.  (Tr. 836–49).  At follow-ups on September 6, 2016, and October 13, 2016, Barrett noted that M.V. had difficulty doing his homework.  (Tr. 846, 848).

On March 29, 2016, M.V. saw psychologist Douglas Felt, M.A., for a psycho-educational assessment.  (Tr. 775–76).  Felt noted that M.V. often displayed a poor attention span and impulsivity, he had sloppy table manners, and he did not "participate in regular educational class

12

during group." (Tr. 775). Felt stated that testing showed that M.V. was in the "mentally deficient range overall," and that he had low scores across his academic achievement subtests. (Tr. 775). Felt stated that M.V. had a full-scale IQ of 64, with a verbal comprehension score of 70, visual spatial IQ of 72, fluid reasoning IQ of 72, working memory IQ of 69, and processing speed IQ of 63. (Tr. 776).

### C. Opinion Evidence

#### 1. Treating Source—Nurse Practitioner Coleen Shaw

On November 6, 2016, nurse Shaw completed a medical source statement concerning M.V.'s mental impairments. (Tr. 931). Shaw opined that M.V. had "moderate limitations" in attending and completing tasks, interacting and relating with others, and caring for himself. (*Id.*).

#### 2. Consultative Examination—Mark Hammerly, Ph.D.

On June 19, 2014, M.V. saw Mark Hammerly, Ph.D., for a consultative examination on referral from the Division of Disability Determination. (Tr. 447–56). Dr. Hammerly noted that M.V. was alert and oriented, and that his mental control, concentration, and memory were "grossly intact." (Tr. 451). He estimated that M.V. had "low borderline" abstract reasoning ability. (*Id.*). M.V. had adequate concentration, pace, and persistence for testing; however, empirical testing indicated that he had "a poorly-developed ability to concentrate and manipulate information purely in the mind." (*Id.*). Testing also indicated that M.V.'s persistence and ability to sustain concentration and attention were "not comparable to children his age." (*Id.*). His social planning and judgment were "somewhat deficient but . . . still estimated borderline when compared to the normative sampling distribution." (Tr. 452). Hutcherson told Dr. Hammerly that M.V. spent most of his time playing video games or outside playing football, and his chores

13

included taking out the trash, washing dishes, cleaning his room, and vacuuming.  (*Id.*).

Dr. Hammerly noted that M.V. was "properly motivated" during testing and did not attempt to

quit early due to frustration.  (Tr. 453).  Dr. Hammerly determined that M.V. had a full-scale IQ

of 71, with a perceptual reasoning IQ of 77, working memory IQ of 80, and processing speed IQ

of 75, indicating borderline intelligence.  (*Id.*).  Dr. Hammerly diagnosed M.V. with ADHD,

disruptive behavior disorder, and borderline intellectual functioning, and he gave him a GAF

score of 52.  (Tr. 453–54).  Regarding M.V.'s ability to attend and complete tasks, Dr.

Hammerly stated that M.V.:

> [was] able to track the flow of conversation adequately through the clinical
> interview, and did not show significant distraction by office sounds or objects in
> the room.  Still, [M.V.'s] relevant composite scores today show some reduced
> capacity in this area.  For example, Working Memory is scored at 80, and
> Processing Speed at 75, indicating lowered ability that would translate into
> sub-normal academic performance on tasks requiring a high degree of
> concentration, attention, persistence and pace relative to same-age peers.

(Tr. 455).

### 3.    State Agency Consultants

On July 13, 2015, state agency consultant Robelyn Marlow, Ph.D., reviewed M.V.'s

medical records and determined that he had "less than marked" impairments in attending and

completing tasks.  (Tr. 126).  She stated that, although M.V. ADHD and displayed some

impulsivity, he benefited from medications and had an intact memory.  (*Id.*).  On July 24, 2015,

Luis Goorey, M.D., agreed that M.V.'s mental limitations did not meet the Social Security

Administration's guidelines for disability.  (Tr. 128–29).  On October 21, 2015, Judith

Schwartzman, Psy.D., concurred with Dr. Marlow's opinion, and on November 2, 2015,

Elizabeth Roseberry, M.D. concurred with Dr. Goorey's opinion.  (Tr. 138–39, 141–42).

### D.      Relevant Testimonial Evidence

M.V. testified at the ALJ hearing.  (Tr. 79–95).  M.V. stated that he was 13 years old, and that he lived with his mother and father.  (Tr. 79).  M.V.'s family had a pit bull, which he took care of "sometimes."  (Tr. 80).  In his free time, he liked to watch TV, listen to music, and play video games.  (Tr. 80–81).  He played outside about three times per week, he rode a bike, and he played football.  (Tr. 82–83).  He had one neighborhood friend.  (Tr. 82).  M.V. stated that he took care of his personal needs in the morning, including washing, brushing his teeth, combing his hair, and tying his shoes.  (Tr. 85).  His household chores included taking out the trash and washing dishes, and he did them without being told "most of the time."  (Tr. 85–86).  He stated that he got yelled at if he did not do his chores.  (Tr. 86).  M.V. slept well at night and took his medicine regularly.  (*Id.*).  M.V. stated that he was in the 7th grade, and he had a different teacher for each course.  (Tr. 87).  He stated that he had a special education teacher, and that his grades were "kind of bad," including Fs in social studies and science.  (Tr. 88–89).  He got bad grades because he did not turn in his daily homework.  (Tr. 89, 91–92).  He said that he was turning in his homework on time for three out of four days per week, but that he had turned in all his homework on time the week before the hearing because his mother took his TV away.  (Tr. 92–93).

Hutcherson also testified at the ALJ hearing.  (Tr. 95–??).  Hutcherson stated that she had to remind M.V. "on certain occasions" to brush his teeth and take care of himself in the morning.  (Tr. 96).  M.V. complained about doing his chores, got frustrated, and threw plates, and that she had to constantly prompt him to clean his room.  (Tr. 96–97).  She stated that M.V. had a pet turtle that he took care of "sometimes."  (Tr. 98).  Hutcherson stated that M.V. did not accept discipline from his father, who was incarcerated for 8 and a half years, but he was respectful to

15

her. (Tr. 102–03). She stated that M.V. took ADHD medication, which made him more focused. (Tr. 105). She stated that M.V.'s primary disability was that he was on the autism spectrum. (*Id.*).

Hutcherson stated that M.V. was not doing well in public school, was not given work at his grade level, and did poorly in the second half of the school year, and that she put him into private school to get him to work at his grade level. (Tr. 98–99, 104). The private school gave him the support he needed and pulled out of his mainstream classes for special education in reading and math. (Tr. 100). Nonetheless, he continued to have trouble completing his homework "depending on the subject and what it is." (Tr. 106). Hutcherson stated that if M.V.'s homework required effort, he would get frustrated, throw papers and pencils, scratch himself, and say that he's stupid. (*Id.*). The school started giving M.V. less homework to do because his workload was overwhelming, and he went to "learning club" at Harbor twice a week to work on his reading and math skills. (Tr. 107–08). Hutcherson stated that M.V. had trouble with his homework because he got distracted, and that his ADHD medication improved his distraction. (Tr. 108–09).

## V.     The ALJ's Decision

On April 6, 2017, the ALJ issued a decision determining that M.V. was not disabled and denying his application for supplement security income. (Tr. 32–53). The ALJ noted that, although M.V. was previously awarded SSI benefits in January 2012, he was subsequently removed from payment status on September 8, 2014, based on a continuing disability review finding that he had improved. (Tr. 32). The ALJ determined that there was no basis for reopening the prior decision and concluded that res judicata precluded a consideration of the

16

period before M.V.'s March 12, 2015, application.[3]  (*Id.*).  The ALJ determined that, since filing

his application, M.V. had not engaged in substantial gainful activity.  (Tr. 35).

At Step Two, the ALJ found that M.V. had severe impairments, including ADHD,

affective disorder, and learning disorder.  (*Id.*).  The ALJ found that M.V.'s asthma, speech and

language disorder, and disruptive behavior disorder were non-severe, because they did not

impose more than minimal limitations on his ability to engage in functional activities.  (*Id.*).

Further, the ALJ found that M.V.'s alleged autism spectrum disorder was not a medically

determinable impairment, because it was not supported by objective medical signs or findings.

(Tr. 36).

At Step Three, the ALJ determined that M.V. did not have an impairment, or combination

of impairments, that met, medically equaled, or functionally equaled the severity of the listings.

(Tr. 36–53).  The ALJ found that M.V. did not functionally equal the severity of the listings

because, although he had marked limitations in acquiring and using information, he had less than

marked impairments across all other domains.  (Tr. 46–53).  With regard to M.V.'s ability to

attend and complete tasks, the ALJ stated:

> The claimant has less than marked limitation in attending and completing tasks.
> In the child disability and function reports, the claimant's mother reported that the
> clamant has been diagnosed with ADHD and has been on medications for
> difficulties in the classroom environment.  A review of the claimant's medical
> records from Harbor and the Zepf Center show that the claimant has been
> diagnosed with developmental disorders and ADHD, for which he has received
> medications and supportive counseling services.  Additionally, the claimant's
> teachers have submitted a number of teacher questionnaires showing that the
> claimant has significant limitations in maintaining attention and concentration
> without supportive intervention and special education services.  However, this is
> contrasted by reports from Harbor that the claimant's attention issues have
> improved somewhat since he started medications.  Therefore, based on the
> foregoing, I find that the claimant has less than marked limitations in attending
> and completing tasks.

---

[3] Hutcherson does not challenge the ALJ's decision not to reopen the decision terminating her previously awarded benefits.  *See generally* ECF Doc. 13.

(Tr. 48) (emphasis and citations omitted).

In reaching his decision, the ALJ noted that he considered all the relevant evidence in the case record, including the objective medical evidence; statements from M.V.'s medical sources, teachers, family, and friends; and M.V.'s statements. (Tr. 37). The ALJ noted that records from Harbor indicated that M.V. had "some improvements in functioning with conservative mental health care . . . [,] improving [grades] with supportive services . . . [, and] 'some improvements' in coping skills." (Tr. 40). The ALJ also stated that he gave great weight to the opinions of teachers Bagland, Jackson,[4] Langsdorf, Bossenbroek, and Rohrer, because he found that they were consistent with objective medical testing and the records from Harbor. (Tr. 40–43). Further, the ALJ gave great weight to Dr. Hammerly's and SLP Kruszewski's opinions. (Tr. 43–44). In light of his findings, the ALJ determined that M.V. was not disabled from March 12, 2015, through the date of his decision and denied M.V.'s application for supplemental security income benefits. (Tr. 53).

## VI. Law & Analysis

### A. Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. §§ 405(g) and 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

---

[4] The ALJ's decision erroneously refers to Pamela Jackson as "Pamela Anderson." (Tr. 41).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (providing that, if the Commissioner's findings as to any fact are supported by substantial evidence, those findings are conclusive); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying.").  Even if the court does not agree with the Commissioner's decision, or substantial evidence could support a different result, the court must affirm if the Commissioner's findings are reasonably drawn from the record and supported by substantial evidence.  *See Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record.").  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Though the court's review is deferential, the court will not uphold the Commissioner's decision when the ALJ failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, however, we review decisions of administrative agencies

for harmless error.  Accordingly, . . . we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (citations and quotation omitted)).  Furthermore, the court will not uphold a decision, even when supported by substantial evidence, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

### B.     M.V.'s Ability to Attend and Complete Tasks

Hutcherson argues that the ALJ failed to sufficiently analyze M.V.'s ability to attend and complete tasks, and that substantial evidence did not support the ALJ's conclusion that M.V. had less than marked limitations in this domain.  ECF Doc. 13, Page ID# 1058–61.  Specifically, Hutcherson asserts that the ALJ's explanation – that the teacher opinions contrasted with Harbor records indicating M.V.'s attention issues "improved *somewhat*" with medication – failed to explain how those records undermined the teacher opinions, when the ALJ also stated that he gave great weight to the teacher opinions because they were consistent with Harbor's records. *Id.* at 1059–60.  Further, Hutcherson contends that the vague statement that M.V. "improved somewhat" is not substantial evidence to undermine those teacher opinions.  *Id.* at 1061.

Accordingly, Hutcherson asks that this court "at a minimum" remand the application for further review. *Id.* at 1061–62.  The Commissioner responds that substantial evidence, including Zepf Center records and Bossenbroek's, Bagland's, Dr. Hammerly's and nurse Shaw's opinions, supported the ALJ's finding that M.V. did not have marked limitations in attending and completing tasks.  ECF Doc. 14, Page ID# 1075–77.  Hutcherson's reply brief reiterates her argument that the ALJ did not adequately reconcile his statements one the one hand giving great weight to the teacher opinions, but on the other rejecting them in the analysis of the attending and completing tasks domain.  ECF Doc. 15, Page ID# 1084.  She adds that the court should not rely on the Commissioner's *post hoc* rationalization that Bagland's, Bossenbroek's, nurse Shaw's, and state agency consultants' opinions supported the ALJ's decision given that the ALJ himself did not cite these records in support of his conclusion.  *Id.* at 1084–85.

At Step Three of the sequential analysis, a claimant must prove that his impairments meet or medically equal a listed impairment.  20 C.F.R. § 416.924(d).  If a child claimant's impairments meet or medically equal a listed impairment, then he is conclusively presumed disabled.  20 C.F.R. § 416.924(d)(1).  If not, then he will be found not disabled.  20 C.F.R. § 416.924(d)(2).  A child's impairment is considered to functionally equal the listings when he has marked limitations in at least two out of six domains of functioning, or an extreme limitation in just one.  20 C.F.R. § 416.926a(a); *Elam*, 348 F.3d at 127.  The six domains include: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  A "marked" limitation is "more than moderate" and "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(a), (e)(2).

The "attending and completing tasks" domain measures a child's ability to focus and maintain attention; to begin, carry through, and finish activities or tasks; to initiate and maintain attention; to focus on an activity or task despite distractions; to perform tasks and an appropriate pace; to change focus after completing a task; to avoid impulsive thinking and acting; and to organize, plan ahead, prioritize, and manage time when completing tasks. SSR 09-4p, 74 Fed. Reg. 7630, 7631 (Feb. 18, 2009); *see also* 20 C.F.R. 416.926a(h). School-aged children are expected to be able to focus long enough to do classwork and homework, follow directions, remember and organize school-related materials, concentrate on details, avoid careless mistakes, change activities without distracting themselves or others, sustain attention well enough to participate in group sports and read alone, complete family chores, and complete tasks without extra reminders or supervision. SSR 09-4p, 74 Fed. Reg. at 7632–33; *see also* 20 C.F.R. § 414.926a(h)(2)(iv). If a child needs frequent prompting, he is not paying attention as appropriately, effectively, or independently as children of the same age who do not have impairments. SSR 09-4p, 74 Fed. Reg. at 7632. Even a child who displays hyperfocus – such as a child with ADHD or autism spectrum disorder's intense interest in videogames or other activities – may nonetheless have marked limitations in this domain. *See* SSR 09-4p, 74 Fed. Reg. at 7632.

The ALJ failed to apply proper legal procedures when he determined that M.V. had less than marked limitations in attending and completing tasks because his analysis did "not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125; *Kinsella*, 708 F.2d at 1059. Here, the ALJ did not sufficiently reconcile the inconsistency generated by his findings that: (1) M.V. had less than marked limitations in this domain based on Harbor records

indicating that his attention issues "improved somewhat" on mediations; and (2) M.V.'s teachers' opinions were due great weight on the ground that they were consistent with Harbor's records and other medical evidence even though the teachers found that he had "significant limitations in maintaining attention and concentration without supportive intervention." (Tr. 40–43, 48).  Moreover, the ALJ's failure to apply proper legal procedures here was not harmless error, as a conclusion that M.V. had marked limitations in attending and completing tasks would have resulted in finding that he was disabled.[5].  (Tr. 46–53); *see also Bowen*, 478 F.3d at 746 (indicating that the harmless error rule applies to the ALJ's legal errors).  Furthermore, substantial evidence does not appear to support the ALJ's decision, as a review of Harbor's records and other medical records indicates that: (1) the notes indicating that he had "somewhat improve[d]" were focused on his behavioral and communication skills, rather than his attention; (2) he did not demonstrate improvement or significant changes in his condition in 2016; and (3) that he continued to have issues with impulsivity, poor attention span, and completing homework in 2016.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125; *Kinsella*, 708 F.2d at 1059; *Rogers*, 486 F.3d at 241; (Tr. 775–76, 790, 794–805, 836–49).  Nonetheless, even if substantial evidence supported the ALJ's decision, the court will not uphold the Commissioner's decision when the ALJ failed to apply proper legal standards and that error is not harmless. *Bowen*, 478 F.3d at 746; *Rabbers*, 582 F.3d at 654.

---

[5] The ALJ had already found M.V. had marked limitations in another domain.  When a child is found markedly limited in two of the six domains, he is functionally equal to a listed impairment and, therefore, entitled to SSI benefits.

## VI.    Recommendation

Because the ALJ failed to apply proper legal procedures and reach a decision supported

by substantial evidence, I recommend that the final decision of the Commissioner be

VACATED, and the matter be REMANDED for further proceedings.

Dated: January 28, 2019

Thomas M. Parker

United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts
within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  See
*U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985),
reh'g denied, 474 U.S. 1111 (1986).